IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FRANCO MENTA,                          )
                                       )
                    Plaintiff,         )
                                       )
                                       )        Civil Action No. 03-1283
                                       )
COMMUNITY COLLEGE OF BEAVER            )
COUNTY,                                )
                                       )
                    Defendant.         )

MEMORANDUM OPINION

CONTI, District Judge

Plaintiff Franco Menta ("plaintiff" or "Menta") commenced this action against the

Community College of Beaver County ("defendant" or the "college") alleging discrimination in

violation of Title VII of the Civil Rights Acts of 1964 and 1991, 42 U.S.C. § 2000e-2(a) and the

Pennsylvania Human Relations Act ("PHRA"), 43 PA.CONS.STAT.ANN. § 951 *et seq*.  This court

heard evidence and argument during a bench trial on September 5, 2006, September 6, 2006 and

October 5, 2006.  On October 19, 2006, defendant filed proposed findings of fact and

conclusions of law.  On October 30, 2006, plaintiff filed his proposed findings of fact and

conclusions of law.  Defendant filed supplemental proposed findings of fact and conclusions of

law on November 14, 2006.

Pursuant to Federal Rule of Civil Procedure 52, this court makes the following findings

of fact and conclusions of law.

**A.**     **Findings of Fact**

1.     In 1989, plaintiff, a male, was hired by defendant as a vocational education supportive

services specialist.  Trial Tr. of Sept. 5, 2006, at 37.  Plaintiff was employed in the Office

of Supportive Services, which is part of the college's Learning Center.  Trial Tr. of Sept.

6, 2006, at 8.  The title of plaintiff's position changed from supportive services specialist

to special services specialist II.  In that position, despite the change in title, plaintiff

continued to perform job duties similar to those duties he performed prior to the change.

Id. at Trial Tr. of Sep. 5, 2006 at 98-99.

2.     In performing the duties of his position, plaintiff secured documentation for disabled

students in an effort to provide supportive services to the students.  Supportive services

included, for example, assistance with note taking, providing special equipment and

providing deaf interpreters for classes.  Trial Tr. of Sept. 5, 2006, at 37.  Plaintiff also

reviewed the students' respective transcripts to ensure that the students were performing

at satisfactory levels in their classes.  Id. at 39.  When a student exhibited academic

problems in a given class, plaintiff provided or arranged for tutoring and acted as a liaison

between the student and the student's instructors.  Id.

3.     Plaintiff's position was funded by three different sources of funding - the Act 101 grant,

the Carl Perkins grant and institutional funds.  Trial Tr. of Sept. 6, 2006 at 65-66.  The

Carl Perkins grant was utilized to provide services for special population students, i.e.,

individuals with disabilities, displaced homemakers, single parents and others.  Id. at 207-

08.

4.     The special services specialist position was renewed on a year-to-year basis. The position

was contingent upon receiving funding from the Carl Perkins grant.  Trial Tr. of Sept. 5, 2006, at 71; Def. Exs. A, B.

**College Restructuring**

5.  In 1997, defendant began a reorganization of the Learning Center.  The college president desired to provide a "one stop shop" where both day and evening students could receive required services relating to recruitment, financial aid and other general information.  The president, therefore, sought to restructure the affected departments.  Trial Tr. of Sept. 6, 2006, at 63-64.

6.  Defendant's Carl Perkins Participatory Committee (the "Perkins Committee") consists of individuals from the community and the college. Id. at 69-70, 208.  It is the Perkins Committee's responsibility to recommend and assist the college in allocating funds that the college receives through the Perkins grant. Id. at 208.  The Perkins Committee reviewed the restructuring plan submitted by the college and determined whether the college was making appropriate adjustments. Id. at 70.  The Perkins Committee approved the restructuring plan.  Id. at 74, 124.  A number of positions within the Office of Support Services were to be eliminated as a result of the approved restructuring plan.  Def. Exs. J-M.

7.  By a memorandum dated June 10, 2002, defendant notified the affected employees and advised those employees about certain details relating to the restructuring. Def. Ex. L. Plaintiff, Cheryl Harrington ("Harrington"), a supportive services specialist, and Michele Pavelek ("Pavelek"), a case manager,  were informed that their respective positions would be terminated effective June 28, 2002.  Id.  The memorandum further notified the

3

affected employees that "[s]hould the College receive substantial approval for the 2002/2003 Perkins Local Plan, two full-time grant funded positions [would] become available." Id.  The June 10, 2002, memorandum informed the employees that they would be given an early opportunity to preview the job vacancy postings for the new positions.  Id.  Finally, the memorandum directed interested employees to prepare for the application process and contact David Albanese ("Albanese"), director of human resources, with any questions.  Id.

8.    During a June 13, 2002 meeting, the Office of Support Services employees were advised that the group would be reorganized and that there would be two new positions created. Trial Tr. of Sept. 6, 2006 at 75-76.  Def. Ex. J.  The parties stipulated that there was, in fact, a reorganization and that defendant believed that the reorganization was necessary. Id. at 62.

9.    Pursuant to the restructuring plan, the Learning Center received approval for two new positions - special populations coordinator and career link/service specialist.  Id. at 203, 219.  Jan Kaminski ("Kaminski"), the Perkins vocational coordinator, developed the job descriptions and qualifications for the two new positions.  Id.  In developing the two new job descriptions and qualifications, Kaminski reviewed a number of academic publications and job postings of a similar nature.  Id. at 203-06, 218-19.  The description of the new positions, as developed by Kaminski, were reviewed and approved by the Perkins Committee.  Id. at 208-09.

10.   Kaminski provided information relating to the job descriptions and qualifications for both the special populations coordinator and career link/service specialist positions to

4

Albanese.  Trial Tr. of Oct. 5, 2006 at 8-10.  In response, Albanese created job postings

for both positions.  Id. at 10.  The job descriptions created by Kaminski were more

detailed than the job postings created by Albanese.  Pl. Exs. 16-19.

11.     The job posting for the special populations coordinator position identified the position as

the "Special Populations Coordinator".  The primary responsibilities listed in the job

posting for the special populations coordinator position informed applicants that the job

required individuals to "coordinate office staff, procedures and services to meet the needs

of career and technical education special populations students, including students with

disabilities."  Pl. Ex. 16.

12.     The qualifications listed in the job posting for the special populations coordinator

position included:

> Bachelor's Degree in Special Education, Psychology or Rehabilitation
> Counseling preferred, or an Associate Degree (concentration in
> Psychology/Social Sciences) required.
>
> Three years experience in a Postsecondary Disabled Student Services
> environment working with individuals with physical challenges and
> learning disabilities, required.
>
> Higher Education Disability Services CEU's and/or Certification
> preferred.
>
> Knowledge of Postsecondary Perkins Local Plan Assurance
> documentation requirements for Special Populations, preferred.

Pl. Ex. 16.  Plaintiff and Harrington possessed the requisite qualifications to apply for the special

populations coordinator position.  See supra ¶¶ 22-25, 28.

13.     The job posting for the career link/services specialist position identified the position as

the "CareerLink/Services Specialist".  The primary responsibilities listed in the job

posting for the career link/services specialist position informed applicants that the job

required individuals to "effectively and efficiently enroll eligible customers on the

Pennsylvania CareerLink system.  Provide individualized career services and job

placement assistance and make referrals to outside support agencies, as necessary."  Pl.

Ex. 18.

14.     The qualifications listed in the job posting for the career link/services specialist position

included:

> Bachelor's Degree preferred, Associate Degree required.
>
> Proficiency in the use of computer-based systems, as well as Microsoft
> Word, required.
>
> Two years experience serving customers in a social service
> environment preferred.

Pl. Ex.18.  Plaintiff and Pavelek possessed the requisite qualifications to apply for the career

link/services specialist position.  See *supra* ¶¶ 22, 24, 26.

15.     Plaintiff received proper notification of the vacancies.  Trial Tr. of Sept. 6, 2006, at 210-

11.

16.     Candidates interested in the two new positions were told to submit a letter of intent and

anything else the candidate wanted to provide.  Trial Tr. of Oct. 5, 2006, at 14.  Beyond a

letter of intent, defendant did not require or advise candidates to provide additional

information for the application process.  Trial Tr. of Sept. 6, 2006, at 14, 210-11.

Applicants were free to submit additional information to the interview committee, but

they were not required to do so.  Trial Tr. of Oct. 5, 2006, at 14, 20-21.  Candidates were

given an opportunity to review the job postings, but were not given copies of either job

description before their respective interviews.  Trial Tr. of Sept. 5, 2006 at 78-79; Trial

Tr. of Sept. 6, 2006, at 104-05, 184, 194, 222, 234; Trial Tr. of Oct. 5, 2006, at 37.

17.   Kaminski did not discuss the job descriptions with any of the candidates.  Trial Tr. of

Sept. 6, 2006, at 184.  Kaminski who participated in the interviews for the special

populations coordinator position did not discuss the nature of the work to be performed in

either position with any candidate prior to the interviews.  Id. at 222-23.  Albanese, who

participated in the interviews for both positions, did not discuss the job descriptions with

any candidate prior to the interviews.  Trial Tr. of Oct. 5, 2006, at 36.  Mike Macon

("Macon"), vice-president of the college, who participated in the interviews for both

positions, did not disclose job descriptions for either position to any candidate prior to the

interview.  Trial Tr. of Sept. 6, 2006, at 104.  Scott Ensworth ("Ensworth"), dean of

enrollment, who participated in the interview for the career link/services specialist

position, did not provide copies of the job descriptions to any candidate prior to the

interviews.  Id.  at 234.

18.   At the time of the restructuring, plaintiff was the only male employed in the Office of

Support Services.  Trial Tr. of Sept. 5, 2006, at 46-47.  Plaintiff did not socialize with the

other employees in his office.  Trial Tr. of Sept. 5, 2006, at 48-49.  At the time of the

restructuring, Kaminski and Harrington did not socialize outside of work.  Trial Tr. of

Sept. 6, 2006, at 185.  Kaminski and Harrington, however, occasionally went to lunch.

Id. at 187-88.  Plaintiff never went to lunch with the other employees. Trial Tr. of Sept. 5,

2006, at 48-19.  Kaminski occasionally brought pizza to work for the employees.

Plaintiff would share the pizza, brought by Kaminski, with his colleagues.  Trial Tr. of

Sept. 6, 2006, at 188-89.

19.    When plaintiff learned about the interview process, he believed that the interviewers had

already made up their minds about who would be hired for the two new positions.  Trial

Tr. of Sept. 5, 2006, at 103, 112, 116, 119, 127.  Plaintiff believed that the interview

process was a sham because of a "gut feeling."  Id. at 106, 112-13, 116, 125, 148.

Plaintiff, who was the only male to apply for either of the two new positions, thought that

the interviewers were unfair to male applicants during the interview process.  Plaintiff's

opinions were based on a "belief that [he] had."  Id. at 109, 116, 125, 128-29, 148.

20.    Prior to the interviews for the new positions, plaintiff asked Macon whether plaintiff

would have a position with the college after the restructuring.  Macon advised plaintiff

that he should look for other avenues.  Id. at 80.  Macon told plaintiff to consider the

options that were available to plaintiff.  The reason Macon gave plaintiff that advice was

because plaintiff's position was not going to be renewed and the new position would be

different.  Trial Tr. of Sept. 6, 2006, at 57.

21.    The interviewers did not require additional information regarding transcripts, job

performance or continuing education, but an applicant was permitted to bring those

materials to the interview.  Trial Tr. of Oct. 5, 2006, at 20-21.  During the interviews, the

interviewers did not ask additional questions about the applicants' transcripts, job

performance or continuing education, but instead relied upon the information submitted

by the applicants.  Trial Tr. of Sept. 6, 2006, at 9-10, 73; Trial Tr. of Oct. 5, 2006, at 56,

66-67, 82-83.

**Qualifications of Interviewees**

22.    While employed by defendant, plaintiff received yearly performance evaluations.  Pl. Exs. 2-6.  The performance evaluations contained the following ratings: not acceptable, fair, good, superior and outstanding.  Trial Tr. of Sept. 5, 2006 at 40.  Plaintiff never received a rating of "not acceptable" in any category.  Id. at 40-41.  Plaintiff received a rating of "fair" in 2 categories throughout his career with defendant.  Plaintiff routinely performed at a rating of "good" or "superior".  Id.  Plaintiff was generally well-liked among students at the college with whom he worked.  Id. at 171.

23.    Harrington received yearly performance evaluations.  Harrington never received a rating of "not acceptable" or "fair".  Harrington consistently received ratings of "good", "superior" and "outstanding".  Pl. Exs. 40-41.

24.    With respect to educational backgrounds of the interviewees, plaintiff had an associate degree from the college.  Pl. Ex.1.  Additionally, plaintiff previously had completed approximately 132 credits toward his bachelors degree at Robert Morris University.  Trial Tr. of Sept. 5, 2006 at 33; Pl. Ex. 1.  During his college course work, plaintiff completed thirteen or fourteen courses in social sciences.  Trial Tr. of Sept. 5, 2006, at 34-35.

25.    Harrington had an associates degree from Slippery Rock University in social science and was enrolled in a bachelors program focusing on psychology.  Harrington had not completed many credits in her baccalaureate work.  Trial Tr. of Sept. 6, 2006, at 191; Pl. Ex. 39.

26.    Pavelek had an associates degree from the college.  Trial Tr. of Oct. 5, 2006, at 31.  Pavelek did not have a bachelor's degree.  Id. at 76.

27.    While employed with defendant, plaintiff attended between seven and thirteen seminars.

9

Trial Tr. of Sept. 5, 2006 at 33-34.

28.     Harrington, who had been employed by the college since June 1999,  had attended seven

seminars and training sessions by March 2002.  Pl. Ex. 39.

**Resumes Submitted for New Positions**

29.     Plaintiff submitted his resume as part of his application for both positions Pl. Ex. 1.

Plaintiff's resume contained the following description of his employment objectives:

"position **in the travel industry** in customer service, public relations or security."  Id.

(emphasis added).  Plaintiff's resume highlighted his organizational, communication,

research, tutoring and records management skills.  Plaintiff noted his ability to solve

problems on an "individual and group bases."  Additionally, the resume highlighted

plaintiff's experience in the fields of catering and security.  Id.  The resume did not

indicate that plaintiff had an interest in applying for a position in the career services or

social sciences fields.

30.     Harrington's resume submitted for the special populations coordinator position listed the

desired position as "Career & Technical Education Special Populations Coordinator."

Harrington's resume detailed her current position with the college and accentuated

Harrington's relevant prior work history.  Harrington highlighted her professional

development efforts by detailing her continuing education classes.  Pl. Ex. 39.

31.     Ensworth remembered that Pavelek brought her resume to the interview.  Trial Tr. of

Sept. 6, 2006 at 239.[1]

**Special Populations Coordinator Position Interviews**

──────────────────

[1]Pavelek's resume was not submitted into evidence during the trial.

32.     On June 26, 2002, plaintiff and Harrington interviewed for the special populations

coordinator position.  Trial Tr. of Sept. 6, 2006, at 8.  Each candidate was interviewed by

an interview committee consisting of two men, Macon and Albanese and one women,

Kaminski.  Trial Tr. of Oct. 5, 2006, at 11, 15-16; Pl. Pl. Exs. 23-25.  At the time of the

trial, Macon and Kaminski were both employed by defendant. Trial Tr. of Sept. 6, 2006,

at 58-61, 168.  At the time of trial, Albanese was no longer employed by defendant but

was instead employed by Carnegie Mellon University.  Trial Tr. of Oct. 5, 2006 at 7.

33.     The interviewer's evaluation sheets contained categories in the following nine areas:

experience/work record, education and training, dependability, motivation, knowledge of

CCBC, interpersonal skills, interview conduct, availability and attitude.  Pl. Exs. 20-31.

All three interviewers ranked Harrington higher overall in the categories than plaintiff

during the interview process.  Pl. Exs. 20-25.

34.     Kaminski's ratings for plaintiff included "good" in four categories and "average" in five

categories.  Kaminski noted that plaintiff "did not answer any of the questions directly or

accurately."  Pl. Ex. 20.  Kaminski also noted that plaintiff appeared to believe that he

should receive the special populations coordinator position because of his length of

service at the college.  Id.  Kaminski found that plaintiff exhibited an attitude of

entitlement throughout the interview.  Trial Tr. of Sept. 6, 2006, at 197.

35.     Kaminski's ratings for Harrington included "very good" in seven categories and "good"

in two categories.  With respect to Harrington's interview, Kaminski noted that

Harrington had "[e]xcellent oral communication skills" and "answered each question

directly and accurately."  Pl. Ex. 23.  Kaminski further noted that Harrington possessed

the educational background, continuing educational training and work experience that qualified Harrington for the position.  Id.

36.     One of the reasons Kaminski rated Harrington higher than plaintiff was because of Harrington's continuing education units.  Trial Tr. of Sept. 6, 2006, at 192.  Although Kaminski had not advised Harrington to do so, Harrington came to the interview with a portfolio containing information related to her training and experience.  Plaintiff did not bring any similar materials with him to his interview.  Id. at 192-93.

37.     Macon's ratings for plaintiff included "very good" in one category, "good" in four categories and "average" in four categories.  Macon noted that plaintiff did not specifically answer questions and only generally referred to the processes.  Macon commented that plaintiff did not refer to his qualifications during the interview process, but instead referred to his length of service at the college.  Pl. Ex. 21.

38.     Macon's ratings for Harrington included "very good" in five categories and "good" in four categories.  Macon noted that Harrington was very nervous during the interview, but found that Harrington appeared to "take a special interest in her work" and understood the processes.  Pl. Ex. 24.

39.     Macon's ratings took into consideration the fact that he had previously reviewed student files maintained by each of the candidates.  Macon found Harrington's work to be superior to plaintiff's work.  Id. at 82-84.  Macon noted that plaintiff had previously violated Perkins standards in failing properly to document a student's file on one occasion.  Id. at 159.  Plaintiff had failed to follow procedures when obtaining an accommodation for a student.  Id at 172-73; Def. Exs. O and P.  Plaintiff was formally

reprimanded for his failure to follow procedures.  Trial Tr. of Sept. 5, 2006, at 137-38.

Macon noted that plaintiff provided only minimal information regarding his continuing

education.  Trial Tr. of Sept. 6, 2006, at 18.  Macon noted that Harrington presented a

portfolio containing information relating to her experience and background working with

adaptive technology and that plaintiff had not done so.  Id. at 86-87.

40.     Albanese's ratings for plaintiff included "very good" in one category, "good" in two

categories, and "average" in six categories.  Albanese noted that plaintiff "generalized his

answers instead of specifically answering them."  Albanese commented that plaintiff

wanted the position because of his length of time with the college.  Pl. Ex. 22.  Albanese

noted that he was familiar with plaintiff's demeanor and found that plaintiff's demeanor

during the interview was not what he would have expected from plaintiff.  Trial Tr. of

Oct. 5, 2006, at 85.

41.     Albanese's ratings for Harrington included "very good" in one category and "good" in

eight categories.  Albanese noted that Harrington answered questions relating to processes

using a team approach.  Pl. Ex. 25.

42.     Albanese noted that plaintiff appeared to have a sense of entitlement because of his length

of service with the college.  Trial Tr. of Oct. 5, 2006, at 23-24.  Another reason Albanese

scored Harrington higher than plaintiff was because plaintiff did not have the best work

record at that point.  Id. at 24.  Harrington had provided the interview committee with

information relating to her continuing education efforts that related to the special

populations coordinator position.  Id. at 19-20.  Albanese noted that many candidates

bring portfolios to interviews to show the interviewers in an effort to showcase the

applicants' talents for the interviewers.  Id. at 23-24.

43.  The interviewers did not require additional information regarding transcripts, job

performance or continuing education, but an applicant was permitted to bring those

materials to the interview.  Id. at 20-21.  The interviewers did not ask additional questions

about the applicants' transcripts, job performance or continuing education, but instead

relied upon the information submitted by the applicant.  Trial Tr. of Sept. 6, 2006, at 9-

10, 73; Trial Tr. of Oct. 5, 2006, at 56, 66-67, 82-83.  There is no evidence of record that

plaintiff brought either his college transcripts or information about his continuing

education efforts to the interview.

44.  Upon completion of both interviews, the interview committee discussed their respective

ratings of each candidate.  Each of the interviewers rated the candidates independently

and without input from the other interviewers.  Trial Tr. of Sept. 6, 2006, at 97-99. The

interview sheets and comments from the interview committee members, reflect that each

interviewer ranked Harrington as the superior candidate.  Pl. Exs. 20-25.

45.  By letter dated June 26, 2002, Albanese informed plaintiff that he had not been selected

for the special populations coordinator position.  Trial Tr. of Oct. 5, 2006, at 25-26; Pl.

Ex.32.  Plaintiff received this letter of rejection on June 28, 2002.  Trial Tr. of Oct. 5,

2006, at 90-91.

46.  The special populations coordinator position was offered to Harrington, who is a woman.

Id. at 33.

**Career Link/Services Specialist Position**

47.  On June 27, 2002, plaintiff and Pavelek interviewed for the career link/services specialist

position.  Trial Tr. of Oct. 5, 2006, at 31, 34.

48.  The interview committee for the career link/services specialist position consisted of three

men,  Macon, Albanese and Ensworth.  Trial Tr. of Oct. 5, 2006, at 33; Pl. Exs. 26-31.

At the time of trial, Macon and Ensworth were employed by defendant.  Trial Tr. of Sept.

6, 2006, at 58-61, 231. At that time, Albanese was not employed by defendant.  Trial Tr.

of Oct. 5, 2006, at 7.

49.  With respect to the career link/services specialist position, on the interview form, which

was the same form used in the interviews for the special populations coordinator position,

Albanese's ratings for plaintiff included "good" in two categories and "average" in seven

categories.  Albanese noted that plaintiff did not respond completely to questions, but did

appear compassionate toward students.  Pl. Ex. 26.  Albanese considered plaintiff's

"improprieties in the workplace" when scoring plaintiff.  Trial Tr. of Oct. 5, 2006, at 29-

30.  Plaintiff presented himself as being entitled to the position because of his length of

service with the college.  Id. at 22-23.

50.  Albanese rated Pavelek "good" in all nine categories.  Albanese noted that Pavelek was

organized and liked to complete tasks.  He also noted that Pavelek appeared to get pulled

in different directions and needed to improve her ability to prioritize.  Pl. Ex. 30.

51.  Albanese found that Pavelek was punctual, completed tasks and fully answered questions

during the interview.  Albanese believed that Pavelek was highly motivated.  Id. at 35.

52.  Macon's ratings for plaintiff relating to the career link/services specialist position

included ratings of "very good" in one category, "good" in four categories and "average"

in four categories.  Macon found that plaintiff did not fully answer questions and

appeared to be looking for any full-time job.  Macon noted that plaintiff was not prepared for the interview.  Pl. Ex. 27.  In making his evaluation, Macon noted he had concerns about plaintiff's work history and experience because plaintiff had "issues" with students and others.  Macon also had concerns about plaintiff because of plaintiff's answers to questions during the interview.  Trial Tr. of Sept. 6, 2006, at 101-02.  Macon did not believe that plaintiff was prepared for the interview.  Id. at 102.  Macon did not believe that plaintiff wanted to be at the interview.  He noted that plaintiff's interaction was not good during the interview.  Id. at 106.

53.  Macon rated Pavelek "very good" in four categories and "good" in five categories.  While Macon noted that Pavelek's language was a little rough, he found that she otherwise made a good presentation.  Pl. Ex. 29.  Macon found Pavelek was well organized during the interview process, but plaintiff was not.  Id. at 105-06.

54.  Ensworth rated plaintiff "good" in three categories and "average in six categories.  Ensworth found that plaintiff exhibited a weakness in answering questions asked during the interview.  Pl. Ex. 28.  As a result of plaintiff's demeanor, Ensworth questioned whether plaintiff was actually interested in the position.  Trial Tr. of Sept. 6, 2006, at 237.  There is no evidence that plaintiff brought a portfolio of his work with him to the interview.  Plaintiff did not fully answer questions and did not provide details about his work or educational experience.  Id. at 236.

55.  Ensworth's ratings for Pavelek included ratings of "very good" in seven categories and "good" in two categories.  Ensworth found that Pavelek had good organizational skills and did a "nice job of interviewing."  Pl. Ex. 31.  Pavelek brought a portfolio of her work

16

with career services.  Trial Tr. of Sept. 6, 2006, at 236.  Ensworth believed that Pavelek

was more interested in or committed to the position than plaintiff.  Id. at 237-38.

56.     Ensworth rated Pavelek higher on his evaluation in part because Pavelek had completed

an internship in career services and had worked there part-time.  Ensworth believed that

experience was more valuable than plaintiff's number of years with the college because

those years were not spent in the career services area.  Id. at 235.  Ensworth was further

impressed by Pavelek's portfolio and presentation.  Id. at 236-37.  Pavelek submitted to

the interviewing committee additional information relating to her performance and

qualifications for the career link/service specialist position.  Id. at 102, 130, 236.

57.     Upon completion of all of the interviews, the interview committee discussed their

respective ratings of each candidate.  Each of the interviewers rated the candidates

independently and without input from the other interviewers.  Trial Tr. of Oct. 5, 2006, at

87.  Each interviewer ranked Pavelek as the superior candidate.  Pl. Exs. 26-31.

58.     By letter incorrectly dated June 26, 2002, Albanese informed plaintiff that he had not

been selected for the career link/services specialist position.  Id. at 38; Pl. Ex. 33.

Albanese testified that the letter should have been dated June 27, 2002 not June 26, 2002

because it would not have been drafted until after the interviews were concluded.  Id. at

39.  Plaintiff received this letter of rejection on June 28, 2002.  Id. at 99-101.

59.     The career link/service specialist position was given to Pavelek, who is a female.  Id. at

33.

**Plaintiff's Views about the Interview Process**

60.     Plaintiff believed that the interviewers had made up their minds about the successful

candidates prior to the interviews.  Trial Tr. of Sept. 5, 2006 at 103, 112, 116 and 127.

Plaintiff further believed that the other candidates were given copies of job descriptions

prior to interviews so that they could adequately prepare for the interviews.  Id. at 147-48.

Plaintiff asserts that he would have taken a portfolio and transcripts to the interview or

updated his resume if he had received a copy of the job descriptions prior to the

interview. Id. at 147.

**Plaintiff's Termination**

61.     Because plaintiff did not receive either the special populations coordinator or the career

link/service specialist position, plaintiff's employment by the college was terminated on

approximately June 27, 2002.  Pl. Exs. 32-33.

**B.      Conclusions of Law**

1.      Title VII was enacted to prohibit employers from discriminating against employees with

respect to the compensation, terms, conditions, or privileges of employment.  Texas Dept.

of Community Affairs v. Burdine, 450 U.S. 248, 259 (1981).  Since its inception, Title

VII has made it an "unlawful employment practice for any employer . . . to discriminate

against any individual . . . *because of* such individual's race, color, religion, sex, or

national origin." 42 U.S.C. § 2000e-2(a).[2]

2.      In order to meet his burden of proof the plaintiff must (1) present direct evidence of

discrimination that meets the requirements set forth in Price Waterhouse v. Hopkins, 490

_____

[2]The Title VII analysis applies to plaintiff's PHRA claims.  "We construe Title VII and the PHRA consistently.  See Atkinson v. La Fayette College, 460 F.2d 477, 454 n.6 (3d Cir. 2006). . . ." Scheidemantle v. Slippery Rock Univ., No. 05-3850, 2006 U.S. App. LEXIS 31141, at n.5 (3d Cir. Dec.19, 2006).

18

U.S. 228 (1989), or (2) present "indirect evidence of discrimination that satisfies the familiar three-step framework of McDonnell Douglas Corp., 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." Fakete v. Aetna, Inc., 308 F.3d 335, 337-38 (3d Cir. 2002).

3.    This case does not involve direct evidence of discrimination; therefore, this court must apply the three-step, burden-shifting framework of the McDonnell Douglas test.

4.    The first step of the McDonnell Douglas test requires a plaintiff to present evidence sufficient for a reasonable trier of fact to find each element of a prima facie case. Fakete, 308 F.3d at 338 n.3. To establish a prima facie case of sex discrimination, a plaintiff must establish that: (1) he is a member of a protected class; (2) he is qualified for the position sought; (3) he was rejected for the position; and (4) that the employer filled the position with a similarly situated person from a different class. Barber v. CSX Distribution Services, 68 F.3d 694, 698 (3d Cir.1995).

5.    Defendant does not dispute that plaintiff established a prima facie case for a claim for sex discrimination. This court finds, therefore, that plaintiff met the burden to establish the first step of the McDonnell Douglas test.

6.    The second step of the McDonnell Douglas test places the burden on the defendant to produce evidence that it had "a legitimate, nondiscriminatory reason for the discharge." Id, McDonnell Douglas Corp. v. Green, 411 U.S. at 802.

7.    Defendant's reason for not hiring plaintiff for either the special populations coordinator position or the career link/service special position was that defendant was not the best candidate for the position. Defendant asserts that the individuals hired for the positions received higher scores from the interviewers and, thus, were better candidates for their

19

respective positions.  As articulated, defendant met its burden to show a "legitimate, nondiscriminatory" basis for its employment decision.  See Smithers v. Bailar, 929 (F.2d 892, 895-96 (3d Cir.1980).

8.    If the first and second steps of the McDonnell Douglas test are satisfied, the third step will require the plaintiff to adduce sufficient evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons[,] or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions."  Fakete, 308 F.3d at 338, n.3.

9.    "To discredit an employer's articulated reason, a plaintiff need not produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir.1998) (citing Sempier v. Johnson & Higgins, 45 F.3d 724, 732 (3d Cir.1995)).  Instead, a plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons'" Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir.1994) (quoting Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir.1992); Josey v. John R. Holllingsworth Corp., 996 F.2d 632, 638 (3d Cir.1993)).

10.   In Ezold, the court made clear that "barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions."  Ezold, 983 F.2d at 527 (quoting Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir.1991)).

20

11.    In the instant matter, this court must determine whether defendant's articulated business reason for not hiring him for either the special populations coordinator or career link/service specialist position is unworthy of credence.  After considering the evidence, the court finds that the plaintiff did not meet his burden to show defendant's reason was unworthy of credence.

12.    Many of the factors evaluated by the interviewing committee required subjective opinions of the respective interviewers.  For various reasons, the interviewers gave plaintiff lower scores than the successful candidates.  During the interviews, it appears that plaintiff exhibited a sense of entitlement because of his length of service with the college and did not emphasize his credentials.  Throughout the process, plaintiff showed a lack of preparedness and interest.  For a number of reasons, this court concludes that plaintiff did not engage in the competitive process in a manner requisite for him to be selected for one of the two new positions.

13.    First, upon review of plaintiff's resume, it is clear that plaintiff was not applying for a position as either a special populations coordinator or a career link/service specialist position.  Plaintiff's resume indicated that he was seeking a position in the travel industry. The resume highlighted attributes that had little or nothing to do with the responsibilities attendant to the vacancy postings for the two new positions at the college.  For example, plaintiff's resume highlighted his experience in the field of security, hotel management and catering.  The resume simply did not address, in detail, plaintiff's qualifications for the posted positions.

14.    By contrast, Harrington's resume detailed her experience and continuing education as

those attributes related to the job vacancies.  Plaintiff insists that Harrington received a copy of the job description prior to the interview and was able to make her resume conform to the job description.  This court finds no merit in plaintiff's assertions.

15.     Each interviewer denied giving Harrington, Pavelek or any other candidate a copy of the job description prior to the interview.  The vacancy postings, which plaintiff had access to, listed the desired positions and gave the minimum qualifications for the job. Harrington, unlike plaintiff, took the initiative to submit a resume that conformed with the vacancy posting.  Testimony from Ensworth indicated that Pavelek's resume discussed her qualifications and work experience as it applied to the career link/services specialist position.  This court is not convinced that Harrington and Pavelek needed the actual job descriptions in order to conform their resumes to the desired position. Harrington and plaintiff each worked in positions at the college that dealt with responsibilities somewhat similar to the duties of the special populations coordinator position.  It would not be abnormal, and indeed appropriate, for any candidate to state the desired position was the job identified in the job posting and to identify skills relating to the qualifications identified in the posting.  Plaintiff apparently did not have or take the time to review the posting and revise his resume to fit the positions for which he was applying.  Rather, he simply submitted a resume he appears to have prepared for applying for a position in the travel industry.

16.     Next, plaintiff's demeanor during the interviews was at best average.  Each of the interviewers noted that plaintiff did not fully answer questions.  Harrington, on the other hand specifically addressed the questions and presented herself as knowledgeable in her

field.  Harrington also presented herself as a team player when she used the word "we" to address, with specificity, different processes in the Office of Support Services.  Albanese noted that he was familiar with plaintiff's demeanor and found that plaintiff's demeanor during the interview was not what he would have expected from plaintiff.  Albanese's testimony was particularly credited because he was no longer employed by the college at the time of trial and, therefore, had no perceived bias.  Ensworth commented that it appeared that plaintiff was not interested in being at the interview and he questioned whether plaintiff wanted the job.  Conversely, Pavelek appeared to be highly motivated during her time with the interview committee.  The interviewers noted that Pavelek was organized and completed tasks as well.  Plaintiff simply did not interview well and was less impressive than the successful candidates.  Further, as discussed above, each interviewer noted that plaintiff exhibited a sense of entitlement during the interviews.  During the interviews, plaintiff failed to discuss his qualifications and instead addressed his length of time with the college.

17. Finally, plaintiff did not take the steps necessary to show the interview committees that he was, indeed, the best candidate for the new positions.  Harrington and Pavelek each presented the interview committee with information relating to their qualifications for the new positions.  In Harrington's portfolio, she had information relating to her continuing education and explained how that continuing education qualified her for the special populations coordinator position.  Although Harrington had not completed more course work for her bachelor degree than had plaintiff, Harrington detailed her educational background for the interview committee.  Similarly, Pavelek took information with her to

23

the interview about her qualifications to convince the interview committee that she was

the best applicant for the career link/service specialist position. Because plaintiff failed to

either take additional information with him to the interview or fully discuss additional

information during the interview, his interviews fell short of the interviews of the other

candidates.

18.     Plaintiff argues he believes that the interviewers provided job descriptions to Harrington

and Pavelek prior to the interviews.  Plaintiff asserts that if he had known what the job

descriptions were, he would have updated his resume and taken additional information to

the interview.

19.     This court credits the testimony of the interviewers in this respect.  Each of the

interviewers testified that they did not discuss the jobs with any candidate prior to the

interviews.  Further, each of the interviewers denied giving copies of the job descriptions

to any candidate prior to the interviews.

20.     Plaintiff further argues that the interviewers had the opportunity to question him and

should have questioned him about his educational background and qualifications during

the interview.  Plaintiff, however, misunderstood the interview.

21.     Even before the restructuring, plaintiff knew that his position was not a guaranteed

position.  Plaintiff's position was renewed on a yearly basis depending upon whether the

college received a Perkins grant.  Once the restructuring focused on his department,

plaintiff was even more aware that his employment with the college was in jeopardy.

Plaintiff knew that three positions were eliminated and only two new positions were

available.  At that point, plaintiff should have realized that he had to compete with the

24

other members of his office for a position.

22.     At the time of the interviews, plaintiff had enough information about the positions to

present himself as a candidate for those positions.  Although it is not clear from the

record how far in advance of the interview the candidates received the job vacancy

postings, the postings, which all candidates had access to before the interviews, presented

plaintiff with enough information to prepare adequately for the interviews.  The job

qualifications on the vacancy postings pointed to the importance in a psychology or social

science background.  Plaintiff could have mentioned that he had completed thirteen or

fourteen classes in social sciences.  He failed to do so.  The postings indicated the

continuing education units were important.  Plaintiff could have detailed his continuing

education efforts for the interview committee.  He failed to do so.  As previously

discussed, plaintiff at least could have updated his resume to make it appear that he was a

applying for a job as a special populations coordinator or career link/service specialist and

not attempting to obtain a position in the travel industry.  Here again, plaintiff failed to do

so.  The job postings directed interested candidates to forward a letter of interest and

anything else the candidate thought was necessary to the appropriate party.  Plaintiff

failed to do more than express initial interest in a position.  Apparently, plaintiff believed

that his years of service with the college alone were all that was necessary for the

interview committees to know about his qualifications.

23.     Further, this court does not believe it was necessary for the interview committees to elicit

pertinent information from plaintiff.  All the persons interviewed were treated in the same

manner.  Plaintiff, like the other interviewees, had the opportunity to present his

25

qualifications and experience to the committees.  The other candidates appeared motivated and eager to obtain the position and had better interviews.  Plaintiff failed to bring additional information or discuss his qualifications for the positions.

24.     Throughout the interview process, plaintiff exhibited a lack of preparedness.  Plaintiff erroneously believed that his years with the college entitled him to greater consideration than the employees who had fewer years experience.  Plaintiff had the opportunity to present his credentials and qualifications to the interview committees and he simply failed to do so.  Defendant hired candidates that the interviewers perceived as being more prepared, interested, motivated and better qualified for the special populations coordinator and career link/services specialist positions than plaintiff.  Based upon the evidence of record, the court finds that plaintiff did not satisfy his burden of showing that the reasons set forth by defendant for hiring the other candidates were pretextual or unworthy of credence. See Ezold, 983 F.2d at 527.

25.     Finally, plaintiff could not point to any evidence to establish that the interviewers showed favoritism to women.  Plaintiff's opinions were based on a "gut feeling" and not on anything the interviewers did during the interview.  Mere beliefs and "gut feelings" are not enough to establish a case of gender discrimination. See Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir.1989).

26.     Plaintiff failed to establish that defendant's reasons for not hiring him were pretextual and having failed to meet that burden, judgment must be entered in favor of defendant.

        **AND NOW**, this 25th day of May, 2007, in accordance with this court's findings of fact

26

and conclusions of law, **JUDGMENT** is hereby **ENTERED** against plaintiff and in favor of

defendant.

The clerk shall mark this case closed.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge


cc: Counsel of record

27